## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| DOUGLAS DEVELOPMENT CORP., and JEMAL'S 700 MIDDLETOWN LLC, ) ) ) Plaintiffs, ) ) v. ) ) CLARIOS, LLC, ) ) Defendant. ) | Civil Action No. |

### COMPLAINT

Plaintiffs Douglas Development Corp. ("Douglas") and Jemal's 700 Middletown LLC ("Jemal's) (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendant Clarios, LLC ("Clarios" or "Defendant"), and state as follows:

### NATURE OF THE ACTION

1.      Defendant defrauded the Delaware Department of Natural Resources and Environmental Control ("DNREC"), U.S. Environmental Protection Agency ("USEPA"), and Plaintiffs to minimize its out-of-pocket costs and unjustly enrich itself with the profits from the sale of its contaminated property.

2.      Since the real estate closing of Defendant's former battery manufacturing plant (the "Facility") located at 700 N. Broad Street, Middletown, DE 19709 (collectively, the "Property"), Plaintiffs have been coordinating with governmental agencies to properly remediate the Property as required and decommission the Facility as Defendant originally promised to Plaintiffs and agencies.

3.      This litigation therefore arises out of Defendant's deliberate plan to misrepresent to Plaintiffs, DNREC, and USEPA the condition of its former battery manufacturing plant (the "Facility") located at 700 N. Broad Street, Middletown, DE 19709 (collectively, the "Property").

4.      Through its plant manager (including other employees or agents of Defendant who supplied information to the plant manager), Defendant made knowingly false and misleading statements about the extent, or lack thereof, of its remediation and decommissioning progress, in an effort to conceal the dangerous conditions abandoned at the Property caused by Defendant.

5.      The fraud perpetrated by Defendant successfully resulted in the achieved goals of misleading i) Plaintiffs into buying the Property, and ii) federal and state environmental agencies into accepting Defendant's false and misleading closure filings.

6.      Defendant knowingly made a false and misleading representation in the Purchase and Sale Agreement ("PSA"), claiming that the prior owner and Defendant had remediated the Property under governmental oversight, despite being aware of the false and misleading information in Defendant's submittals to those agencies.

7.      Plaintiffs relied upon Defendant's misleading statements and actions in purchasing the Property and, subsequent to closing, discovered high levels of lead debris and dust in and at the Property, a condition which Defendant falsely indicated would be addressed by closing.

**THE PARTIES**

8.      Douglas is a corporation organized under the laws of the District of Columbia. At all times relevant to the alleged misconduct herein, Douglas purchased the Property from Defendant.

9.      Jemal's is a limited liability company organized under the laws of the State of Delaware. At all times relevant to the alleged misconduct herein, Jemal's is the current owner of the Property.

10.      Defendant is a limited liability company organized under the laws of the State of Wisconsin. Defendant's registered agent is The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

11.      At all times relevant hereto, Defendant previously owned the Facility located on the Property and sold the Property to Douglas.

## JURISDICTION AND VENUE

12.      Personal jurisdiction over Defendant is proper pursuant to the provisions of the PSA executed by Defendant, and because Defendant systematically and continuously transacts business in the State of Delaware and the Defendant's principal place of business is within this judicial district.

13.      This Court has subject matter jurisdiction over Plaintiffs' claims under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

14.      This Court has subject matter jurisdiction over Plaintiffs' claims under the Delaware Hazardous Substance Cleanup Act and regulations ("HSCA") and common law pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction) as those claims arise out of the same facts and circumstances as Plaintiffs' federal statutory claims and form part of the same case and controversy.

15.     Venue is proper in the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1391 because the events and omissions which give rise to the claim occurred within this judicial district.

16.     Venue is also proper in the United States District Court for the District of Delaware pursuant to 42 U.S.C. § 9613(b) because venue shall lie in any district where the release or damages occurred.

## COMMON ALLEGATIONS OF FACT

### Defendant operates the Property as a lead-acid battery manufacturing plant for nearly sixty years.

17.     Defendant is a successor to, and formerly known as, Johnson Controls Battery Group, Inc. ("JCBG").

18.     For nearly six decades, from 1961 to 2020, Defendant operated a lead-acid battery manufacturing plant in Middletown, establishing itself as one of the world's largest automotive battery suppliers and producing millions of batteries each year.

19.     During its operation, the Facility was a large quantity generator ("LQG") under the Resource Conservation and Recovery Act ("RCRA").

20.     In March 1983, the Facility's baghouse collection system released approximately 75 pounds of lead into the air over a 10-hour period.

21.     The baghouse release was reported to DNREC.

22.     DNREC and the USEPA jointly inspected the Facility in December 1983, collecting samples from site soil, sediment, and surface water of Dove Nest Branch, and water from a domestic well.

23.     In March 1994, USEPA entered an Administrative Consent Order with Defendant (as JCBG), directing Defendant to perform an RCRA Facility Investigation ("RFI").

4

24.     In June 1994, Defendant submitted an Environmental Investigation Work Plan to USEPA and DNREC.

25.     On June 16, 2009, DNREC approved the environmental covenant, placing land-use restrictions on the Property (the "Environmental Covenant").

26.     Restrictions established a use restriction (restricting use to only non-residential use), "No Dig Areas," groundwater withdrawal limitations, and future compliance with the Soil Management Plan and related regulations.

27.     In 2016 the Facility started an expansion project in the No Dig Areas outlined in the Environmental Covenant.

28.     At all relevant times, Tetra Tech, Inc. personnel served as Defendant's environmental consultant and agent, acting under Defendant's direction.

29.     In November 2017, the consultant, Tetra Tech, submitted a closure report as part of the Facility's expansion and soil management.

30.     Soil sampling was performed completed by in December 2019 in the grassy area in front of the Facility along Broad Street.

31.     The results of the assessment identified four areas where soil exceeded the 400 mg/kg level.

**Defendant purports to decommission the Facility
and remediate the Property.**

32.     Upon information and belief, Defendant closed its Facility in May 2020.

33.     At all relevant times, Moran Environmental Recovery ("MER") served as one of Defendant's decommissioning consultants and agents, acting under Defendant's direction.

34.     MER finalized a decommissioning scope of work for the Facility in May 2020, which, among other things, falsely and/or misleadingly provided that:

a.      "Upon completion of the line machinery/equipment wipe down, MER will wipe down all overhead piping/conduit, ceiling beams, ceiling surfaces, and floor with a De-lead solution";

b.      MER/Defendant will ensure that various "items have been cleaned to an acceptable standard (visually clean only) prior to moving onto the next unit/phase";

c.      MER would clean and wipe down various pieces of equipment;

d.      The Facility will be "returned to the customer in a clean, oxide dust free state" to "help[] to provide a safe work site"; and

e.      MER Program Manager and Defendant's Manager will "walk through all work areas together to ensure cleanliness and customer satisfaction prior to MER's departure from the site."

35.     Defendant established a decommissioning plan to purportedly, among other things, remove lead dust from processing equipment and remediate lead from the stormwater basins.

36.     At all relevant times, Kelly Wright served as Defendant's Environmental Health and Safety ("EHS") Regional Manager.

37.     DNREC's Wendy March, then an Environmental Scientist in DNREC's Remediation Section, submitted a Long-Term Stewardship Inspection letter to Mr. Wright on October 14, 2020, noting that, based on visual observations and information gathered during the assessment, no violations of the Environmental Covenant or Soil Management Plan were observed.

38.     By April 2021, the four areas identified in the assessment work were, upon information and belief, excavated and filled with fill, and 142 cubic yards of soil were reported as removed.

39.    Based on Defendant's representations, governmental agencies did not require further action for soil.

40.    Upon information and belief, the soil remedial action and offsite disposal activities were completed, and approved by DNREC, to ensure that the 2021 Property remedial work met the requirements of the selected remedy for the Facility.

41.    As of November 18, 2021, the work plan for stormwater basin cleaning was with DNREC for approval.

42.    Upon information and belief, DNREC approved Defendant's work plan for stormwater basin cleaning based on Defendant's representations made therein.

43.    Acting under Defendant's direction, Harish K. Mital of Tetra Tech submitted a letter to Wendy March of DNREC, dated January 7, 2022, which provided the following false and/or misleading statement: "The manufacturing plant has not been in operation for several months, the interior plant cleaning work that [sic] has been completed. As soon as these basins can be cleaned out, there should not be any concern from this plant's stormwater."

**<u>Defendant contracts with Douglas to purchase the Property<br>and engages in environmental due diligence.</u>**

44.    Douglas and Defendant executed the PSA on January 28, 2022.

45.    A true and correct copy of the PSA is attached hereto as **Exhibit A**.

46.    Douglas and Defendant subsequently executed three amendments to the PSA, generally extending the environmental due diligence inspection period, while keeping the PSA's other terms intact.

47.    Among other things, the PSA expressly excludes from any releases or waivers "ANY ACT, OMISSION AND/OR FRAUD PERPETRATED BY SELLER[.]" [PSA ¶ 13 (emphasis in original).]

48.    That exclusion survived closing.

49.    Ms. Wright submitted a letter to DNREC, dated February 22, 2022, attaching a hazardous waste report for the Facility and noting that "[a] closure performance report will be submitted within 90 days of the actual closure date, as required by 40 CFR §262.17(a)(8)."

50.    Defendant, engaged in false and/or misleading actions because Defendant had no intention to, and did not, close the Facility in compliance with 40 CFR §262.17.

51.    At all relevant times, ENVECO Environmental Solutions, LLC ("ENVECO") personnel served as Plaintiffs' environmental consultant and agent.

52.    At all relevant times, CBRE, Inc. ("CBRE") personnel served as Defendant's broker and agent.

53.    At all relevant times, Tom Kettinger served as Defendant's Senior Manager for EHS Remediation.

54.    On March 23, 2022, ENVECO submitted targeted questions to Defendant and CBRE about remediation and decommissioning.

55.    In response, on April 1, 2022, John Kaczowka of CBRE emailed responses drafted by Mr. Kettinger, Ms. Wright, and CBRE, which, among other things, Mr. Kettinger provided the following representations:

a.    Regarding the Environmental Covenant, there is no maintenance required and there is no required inspection by the property owner;

b.    The Facility was never deemed unsafe for future use and Defendant underwent decommissioning and cleaning work voluntarily—there is no regulation that required this work or certification process;

8

c.      There is no "certification" process that deems the Facility safe for occupancy;

d.      There are no regulatory standards for levels of lead dust in a non-residential building;

e.      For the cleaning of the Facility, Defendant voluntarily used the "very conservative HUD standard" as the standard to determine when an area was "Cleaned";

f.      All known and accessible pits, sumps, and vaults within the Facility have been cleaned; and

g.      All HVAC systems, including the ventilation duct work, have been cleaned.

56.      In addition, Michael Bruzzesi of ENVECO emailed Mr. Kaczowka of CBRE and the Plaintiffs' team on April 5, 2022.

57.      Mr. Bruzzesi's email to Mr. Kaczowka stated: "If possible and of great benefit, we would like a Clarios representative knowledgeable of the work completed present during the visit to answer any questions we may have."

58.      Mr. Bruzzesi arranged for ENVECO personnel to perform a site reconnaissance of the Facility on April 6, 2022 (the "Site Reconnaissance").

59.      On behalf of Plaintiffs, Daniel Wilhelm, Michael Bruzzesi, and Cameron Funke of ENVECO performed the Site Reconnaissance of the Facility on April 6, 2022.

60.      Defendant's representative and agent, Dan Rattay, accompanied ENVECO during the Site Reconnaissance.

61.      Ms. Kelly Wright was also present at the Property during ENVECO's Site Reconnaissance to answer questions.

62.     During the Site Reconnaissance, Mr. Rattay and Ms. Wright, as well as other agents and employees of Defendant present at the Facility, indicated to Daniel Wilhelm, Michael Bruzzesi, and Cameron Funke that:

a.      Defendant was using equipment, such as various lifts, to decommission the Facility.

b.      Defendant was consolidating remnant materials and cleaning/containerizing the lead debris/dust throughout the Facility.

c.      Some equipment was being removed and cleaned during decommissioning whereas some fixed equipment would likely remain after Defendant completed the Facility's decommissioning.

d.      Dumpsters and cleaning equipment were being used to decommission the Facility.

e.      Defendant was remediating the Property and decommissioning the Facility under EPA's and DNREC's supervision.

63.     ENVECO observed remnant equipment and lead in melting crucibles, battery terminals, shims, and dust throughout the Facility.

64.     As a result, ENVECO personnel, including Mr. Bruzzesi, discussed with Ms. Wright on that same day that Defendant would provide a document that verified all decommissioning and cleanup work performed and not yet completed. The conversations between Plaintiffs and Defendant consistently referenced Defendant's intent and plan to fully decommission the interior and close the plant to the satisfaction of the regulators.

65.     On April 7, 2022, Mr. Bruzzesi emailed requests for closeout reports related to completed decommissioning and cleanup work from CBRE personnel, including Mr. Kaczowka.

66.     On April 8, 2022, Ms. Wright responded to one of Mr. Bruzzesi's inquiries via email, stating that, "A reminder too that the entire expansion building (built in 2016-2017) was constructed on remediated soils (per the soil management plan), meaning that the soils were excavated two feet down, samples taken and confirmed to be below action level, and work approved by DNREC before proceeding with the foundation."

67.     On May 3, 2022, Mr. Kaczowka of CBRE responded to follow-up questions posed by Dan Wilhelm of ENVECO, in which he stated that Defendant, or its agents, will be providing a workplan detailing what Facility decommissioning work has been completed.

68.     ENVECO finished a Phase I Environmental Site Assessment for the Property on May 27, 2022 (the "Phase I ESA").

69.     As reflected in the Phase I ESA, Defendant's agents and employees indicated that decommissioning of the Facility and its equipment was ongoing to reach completion.

70.     Plaintiffs relied on Defendant's reportedly ongoing decommissioning efforts of the Facility.

71.     As set forth above, Defendant, through its agents and employees, made statements about decommissioning efforts, alongside active cleaning of the Property's stormwater basins, to demonstrate to Plaintiffs they were remediating the Property and decommissioning the Facility in accordance with applicable law and regulations.

72.     Per the third PSA amendment, the closing was scheduled to occur in August 2022.

73.     Defendant omitted material information in its communications and submittals to Plaintiffs about the extent of Defendant's remediation and cleaning efforts in a deliberate attempt designed to conceal Defendant's intent to conduct minimal decommissioning of the building and leave the task, and attendant cost, to Plaintiffs.

74.    In the days prior to and after the closing of the Property, Defendant (individually and through its agents) repeatedly, knowingly, and falsely represented to Plaintiffs that the Facility would be, and eventually was, completely decommissioned and the Property remediated to acceptable lead levels.

75.    In closing on the Property, Plaintiffs (directly or through its agents) relied on the aforementioned false and/or misleading representations indicating Defendant's completion of lead remediation and Facility decommissioning.

76.    Douglas and Defendant closed on the Property on August 15, 2022.

77.    The PSA allows Douglas, without Defendant's consent, to freely assign its rights and delegate its duties under the PSA, to any of Douglas's affiliates or principals.

78.    Douglas subsequently assigned its rights, duties, and obligations to Jemal's.

**Defendant misrepresented to Plaintiffs as well as federal and state environmental agencies about the Property's remediation and Facility's decommissioning.**

79.    Plaintiffs' purchase of the Property was based upon, among other things, Defendant's statements and representations that the Facility was decommissioned in accordance with the MER Work Plan, memorialized in a final report to be provided.

80.    In addition, Plaintiffs' purchase was based upon Defendant's contractual representation that "[t]he prior owner and Seller have remediated the Property under the oversight of the U.S. Environmental Protection Agency and the Delaware Department of Natural Resources and Environmental Control." (PSA ¶ 8.1.11.)

81.    Defendant knowingly, misleadingly, and falsely represented in the PSA (signed by Claudio Morfe on behalf of Defendant) that the prior owner and Defendant had remediated the Property under the oversight of USEPA and DNREC.

82.    Unsafe levels of lead remained at the Property and inside the Facility despite Defendant's representations and assurances to the contrary.

83.    Defendant's misleading actions are all further underscored by the Property visits organized and/or on behalf of Defendant, which contained no protective equipment and exposed Plaintiffs and their agents to unsafe conditions, which unsafe conditions Defendant knew or should have known about.

84.    Defendant's intentional representations were false and misleading because Defendant misrepresented its remediation and decommissioning progress to federal and state agencies as well as Plaintiffs.

85.    By cover letter dated September 22, 2022, Ms. Kelly Wright wrote to both DNREC and USEPA, enclosing Defendant's formal notification of LQG site closure for the entire Facility ("Notification of LQG Site Closure").

86.    A true and correct copy of the Notification of LQG Site Closure is attached hereto as **Exhibit B**.

87.    Among other things, Defendant's Notification of LQG Site Closure certified that Defendant closed the entire Facility on August 15, 2022, in accordance with applicable closure performance standards:

**15. Notification of LQG Site Closure for a Central Accumulation Area (CAA) (optional) OR Entire Facility (required)**

| ☑ Y ☐ N | LQG Site Closure of a Central Accumulation Area (CAA) or Entire Facility. |
|---|---|
| | A. ☐ Central Accumulation Area (CAA) or ☑ Entire Facility |
| | B. Expected closure date: _____ mm/dd/yyyy |
| | C. Requesting new closure date: _____ mm/dd/yyyy |
| | D. Date closed : __8/15/2022__ mm/dd/yyyy<br>☑ 1. In compliance with the closure performance standards 40 CFR 262.17(a)(8)<br>☐ 2. Not in compliance with the closure performance standards 40 CFR 262.17(a)(8) |

EPA Form 8700-12, 8700-13 A/B, 8700-23                Page _5_ of _6_

88.    In fact, Defendant had not closed the entire Facility in accordance with applicable closure performance standards, as evidenced by Plaintiffs' later site visits and sampling efforts.

89.    The Property's and Facility's condition, created by and/or the responsibility of Defendant, did not meet RCRA's regulatory requirements.

90.    An imminent and substantial endangerment exists on the Property due to the presence of lead dust.

91.    At all relevant times, Tami Kemski served as Defendant's plant manager.

92.    Ms. Kemski certified "under penalty of law that" the Notification of LQG Site Closure (and its attachments) "were prepared under [her] direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted."

93.    Further, Ms. Kemski certified that based on her "inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of [her] knowledge and belief, true, accurate, and complete."

94.    Accordingly, upon information and belief another person or persons, on behalf of Defendant, provided Ms. Kemske with false and misleading information about the Facility's decommissioning and Property's remediation.

14

95.     Defendant knew that the Notification of LQG Site Closure was false and misleading when it was transmitted to DNREC, USEPA, and Plaintiffs.

96.     Defendant knew, or reasonably should have known, that the Notification of LQG Site Closure form would be relied upon by government agencies in addition to Plaintiffs.

97.     Prospect showings at the Property occurred on November 30, 2022, between Defendant and/or CBRE and Norman Jemal and Phil Gardiner (on Plaintiffs' behalf); on December 6, 2022 (Mr. Jemal present); and on October 30, 2023 (Mr. Jemal present) (collectively, the "Site Walks").

98.     During the Site Walks, no individuals were offered or given protective gear against lead inhalation or dermal contact.

99.     Despite the unsafe lead levels still on the Property and in the Facility during the Site Walks, Defendant neither warned or directed its agents or employees to warn or even notified Plaintiffs of the unsafe lead levels they were being exposed to.

100.    Upon information and belief, Defendant made other false and misleading representations to government agencies about decommissioning and remediation at the Property.

101.    DNREC has expressed concern to Plaintiffs regarding Defendant's past representations because the paperwork that Defendant sent to DNREC misrepresented that the Facility was "Clean Closed."

102.    In addition to defrauding Plaintiffs and regulators, Defendant has violated federal and state regulatory cleanup standards, including those under RCRA and Delaware's Regulations Governing Hazardous Waste.

**Plaintiffs find excessive and unsafe amounts
of lead covering the Facility and Property.**

103.    After closing, Plaintiffs learned that Defendant misrepresented the status of the Facility's decommissioning and Property's remediation and had no intention of providing Plaintiffs with a clean or safe Property.

104.    Despite contrary assurances to Plaintiffs, Defendant conveyed the property in a dangerous condition.

105.    Unsafe levels of lead dust remained in exterior locations and inside the Facility, all requiring cleanup.

106.    Defendant intended to sell the Property to Plaintiffs for an amount that did not reflect the Property's actual extent of remediation and decommissioning.

107.    Defendant's fraudulent and misleading assurances regarding the remediation and decommissioning put Plaintiffs off the trail of inquiry as to the Property's true environmental status.

108.    As reflected in the Harvard Environmental Reports previously provided to Defendant, the Facility was not cleaned, and contained significantly elevated lead levels in excess of acceptable standards.

109.    Plaintiffs expect that the samples taken by Defendant's team on February 19, 2024, confirmed elevated lead levels on the Property and in the Facility.

110.    Despite asking for Defendant's sampling results, Defendant has not shared them with Plaintiffs.

111.    Plaintiffs have subsequently demanded that Defendant assume responsibility for the costs, incurred and to be incurred, by Plaintiffs, in association with Property's contaminated condition.

112.    Defendant has refused and continues to refuse to remediate the Property and decommission the Facility as originally promised.

**Plaintiffs are forced to engage with DNREC and environmental consultants to remediate the Property and decommission the Facility.**

113.    Plaintiffs have cooperated with DNREC by reporting the unsafe levels of lead contamination in areas of the Facility as well as outside the doors in surrounding Property areas.

114.    Plaintiffs are cooperating with DNREC to reach compliance under applicable law and regulations including, among other things, adequately securing the Property as a consequence of Defendant leaving, without DNREC's knowledge, an unsafe, dangerous condition. Plaintiffs have also undertaken abatement actions in the interior of the building, a substantial and costly proposition.

115.    At all relevant times, Plaintiffs have implemented and will implement response actions at the Property under the monitoring, and with the ultimate approval, of DNREC.

116.    In so doing, Plaintiffs have incurred necessary response costs, and will continue to incur necessary response costs, consistent with the National Contingency Plan (NCP), 42 U.S.C. § 9605(a), 40 C.F.R. Part 300 et seq.

117.    Among other things, Plaintiffs incurred, and continue to incur, site costs in completing response and/or remediation elements on, or related to, the Facility, as required by DNREC, including but not limited to securing the Property as required under HSCA regulations, and remediating the interior of the building.

118.    In April 2024, Plaintiffs incurred site costs and undertook response actions with respect to the identification, evaluation, and response to hazardous substances on the Property, including those released or threatened to be released at the Facility, in cooperation with DNREC.

119.    Plaintiffs hired Construction Services Group LLC ("CSG") to consult with regulatory agencies on behalf of Plaintiffs and obtain approvals for the Facility's demolition.

120.    CSG communicated with Dave Potter at DNREC's Division of Air in May 2024, who commented that he had "not seen this condition before," referring to the Property's excessive lead levels.

121.    CSG has also coordinated with DNREC's Division of Hazardous Waste to reactivate the Property's EPA ID number to ship Defendant's hazardous lead from the Property.

122.    On or about September 8, 2024, CSG executed a work proposal, estimated at about $6,543,000.00, for lead abatement, demolition, and encapsulation at the Property.

123.    Contrary to Defendant's statements to Plaintiffs, the building was unsafe at closing and not in a condition approved by any regulators, and, in fact, caught the attention of DNREC once the misleading actions were disclosed by Plaintiffs to DNREC. As a direct result of Defendant's intentional and deceptive actions, DNREC required Plaintiffs in May 2024 to erect fencing, signage advising of "Danger – Unauthorized Personnel Keep Out" due the excessive lead levels, and a security system, pursuant to Delaware's Regulations Governing Hazardous Waste, including, without limitation, 7 *Del. Admin. Code* § 1302-264-B-264.14.

124.    Plaintiffs have suffered expectation, consequential, and actual damages along with lost profits.

125.    The site costs Plaintiffs have incurred to date with respect to the Property are ongoing, all of which are required by DNREC.

126.    Plaintiffs anticipated leasing the Facility to tenants in January 2024, as well as to other prospective tenants, but was unable to due to ongoing engagement with governmental

agencies to remediate the Property and decommission the Facility, as Defendant falsely assured it would and had done.

127.    Defendant knew, or reasonably should have known, of Plaintiffs' anticipated leasing plans.

128.    No party other than Plaintiffs have participated in the process of working with DNREC to remediate and decommission the Property after Defendant sold the Property.

129.    Pursuant to Section 113(l) of CERCLA, upon the filing of this Complaint, Plaintiffs will provide a copy of this Complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency.

## COUNT I
### Fraud in the Inducement

130.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

131.    In the days prior to and after the closing of the Property, Defendant (individually and through its agents) repeatedly, knowingly, and falsely represented to Plaintiffs that the Facility would be, and eventually was, decommissioned and the Property remediated.

132.    Defendant also knowingly misrepresented to the EPA and DNREC that the Facility would be, and eventually was, decommissioned and the Property remediated.

133.    At the time Defendant made these false representations, Defendant (individually and through its agents) knew that such representations were false or demonstrated a reckless indifference for the truth.

134.    Based upon Defendant's assurances as well as the governmental oversight and approval of Defendant's remediation, Plaintiffs justifiably relied upon Defendant's representations and were induced to close on the Property.

135.    In making these misrepresentations, Defendant intended on enriching itself at the expense of Plaintiffs by reaping the benefits of an inflated sale price for the Property, by deflecting its own environmental remediation and decommissioning obligations on to Plaintiffs, and by shortcutting a necessary remedial response.

136.    Defendant's false representations justifiably relied upon by Plaintiffs ultimately placed Plaintiffs in an unfavorable position by depriving Plaintiffs of the remediated Property and decommissioned Facility they bargained for, by forcing Plaintiffs to spend significant sums to decommission the Facility and remediate the Property to safe and acceptable levels to tenants, and by obligating Plaintiffs to coordinate with regulators to carry out Defendant's obligations.

137.    Absent Defendant's material misrepresentations and omissions, Plaintiffs would never have entered into the PSA, given extensive potential liability and associated cost they would be forced to incur.

138.    As a result of Defendant's false representations, Plaintiffs have suffered expectation, consequential, and actual damages along with lost profits, in amounts to be determined at trial.

139.    Defendant's conduct was malicious, intentional, and outrageous and warrants the imposition of punitive damages.

## COUNT II
## Fraudulent Concealment

140.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

141.    Defendant fraudulently concealed the true condition and status of the Property's environmental remediation and Facility's decommissioning.

142.    In addition to misrepresentations, fraud may also occur when someone deliberately conceals facts important to a transaction, as has occurred here.

143. Concealment may occur by a person's silence in the face of a duty to disclose the facts or by some action taken to prevent discovery of facts important to a transaction, exemplified by, among other things, Defendant's silence on the dangerous condition of the Property.

144. In the days prior to the execution of the PSA, Defendant repeatedly, falsely, and knowingly represented to Plaintiffs as well as to government agencies that the Property was properly remediated and the Facility decommissioned.

145. Defendant perpetrated such concealment through false and misleading assurances to Plaintiffs as well as false and misleading representations to state and federal agencies.

146. Defendant also perpetrated such concealment through remaining silent about the Property's unsafe lead levels during site walks, negotiations, and at closing, exposing Plaintiffs' personnel, family members, and contractors to unsafe lead levels.

147. Defendant's concealment put Plaintiffs "off the trail of inquiry" as to the true status of remediation and decommissioning.

148. Plaintiffs consequently did not discover that Defendant failed to remediate the Property and decommission the Facility, as represented to Plaintiffs and government agencies, until after closing on the Property.

149. As a result of Defendant's false representations, Plaintiffs have suffered expectation, consequential, and actual damages along with lost profits, in amounts to be determined at trial.

150. Defendant's conduct was malicious, intentional, and outrageous and warrants the imposition of punitive damages.

## COUNT III
### Contractual Fraud

151. Plaintiffs repeat and reallege the prior allegations as if fully restated here.

152.    At all relevant times, Claudio Morfe served as Defendant's General Counsel and Corporate Secretary who signed the PSA on behalf of Defendant.

153.    In execution of the PSA by, upon information and belief an authorized corporate representative, Defendant knowingly, misleadingly, and falsely represented that the prior owner and Defendant had remediated the Property under the oversight of USEPA and DNREC.

154.    At the time Defendant made this false and misleading representation, Defendant knew that such contractual representation was false or demonstrated a reckless indifference for its truth.

155.    At the time Defendant made this false and misleading representation, Defendant knew the Property had not been properly remediated.

156.    Based upon the PSA, Defendant's assurances, as well as the purported governmental oversight and approval of Defendant's remediation, Plaintiffs justifiably relied upon Defendant's contractual misrepresentation and was induced to close on the Property.

157.    In making this contractual misrepresentation, Defendant intended on enriching itself at the expense of Plaintiffs by reaping the benefits of an inflated sale price for the Property, by deflecting its own environmental remediation and decommissioning obligations on to Plaintiffs, and by shortcutting a necessary remedial response.

158.    Defendant's false contractual representation justifiably relied upon by Plaintiffs ultimately placed Plaintiffs in an unfavorable position by depriving Plaintiffs of the remediated Property and decommissioned Facility they bargained for, by forcing Plaintiffs to spend significant sums to remediate the Property and decommission the Facility to safe and acceptable levels to tenants, and by obligating Plaintiffs to coordinate with regulators to carry out Defendant's obligations.

159.    As a result of Defendant's false contractual representation, Plaintiffs have suffered expectation, consequential, and actual damages along with lost profits, in amounts to be determined at trial.

160.    Defendant's conduct was malicious, intentional, and outrageous and warrants the imposition of punitive damages.

## COUNT IV
## Negligent Misrepresentation

161.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

162.    Because Defendant is the previous owner and operator at the Property, and engaged with DNREC and USEPA to remediate the Property, Defendant had a unique and special knowledge about the Property's environmental issues.

163.    Plaintiffs knew Defendant was the previous owner and operator at the Property who had engaged with DNREC and USEPA to remediate the Property and decommission the Facility.

164.    Plaintiffs relied upon the unique and superior knowledge of Defendant to properly report, remediate, and decommission the Property and Facility.

165.    Plaintiffs' business relationship with Defendant, coupled with Defendant's unique and superior knowledge about the Property, created a special relationship of trust, confidence, and dependence between Defendant and Plaintiffs.

166.    Defendant was aware that Plaintiffs relied upon its unique, special, and superior knowledge, expertise, and experience regarding remediation issues at, and decommissioning of, the Property and Facility

167.    Defendant was aware that Plaintiffs depended upon Defendant to be accurate and truthful about Defendant's environmental records and decommissioning status.

168.     Based upon Defendant's intimate and superior knowledge, together with its business relationship with Plaintiffs, Defendant owed a duty to Plaintiffs to provide complete and accurate information regarding Defendant's remediation and decommissioning status. Defendant's duty to Plaintiffs was separate and apart from its duty arising out of the PSA.

169.     Defendant breached its duty to Plaintiffs by filing false and misleading records about remediation and decommissioning, and by making related false or misleading statements in the PSA and to Plaintiffs in the days prior to and after the closing.

170.     At the time Defendant filed false and misleading environmental records with environmental agencies, and made false and misleading statements about remediation and decommissioning to Plaintiffs, they were, at minimum, negligent in stating, reporting, and filing remediation and decommissioning information that was false, misleading, and incorrect.

171.     Such information was known or reasonably should have been known by Defendant and was not known or readily knowable by Plaintiffs.

172.     Defendant knew that Plaintiffs were acting in reliance on the information stated, reported, and filed by Defendant.

173.     Nonetheless, Defendant stated, reported, and filed false and misleading information to further a fraudulent scheme perpetrated against Plaintiffs by Defendant.

174.     Plaintiffs reasonably relied upon the false information provided by Defendant.

175.     As a result of the foregoing, Plaintiffs have suffered a pecuniary loss and expectation, consequential, and actual damages along with lost profits, in amounts to be determined at trial.

## COUNT V
### Breach of Implied Covenant of Good Faith and Fair Dealing

176.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

177.    The PSA is a valid and enforceable contract with certain provisions surviving closing.

178.    By law, the implied covenant of good faith and fair dealing inheres in the PSA.

179.    Plaintiffs and Defendant performed their obligations under the PSA (and its subsequent amendments).

180.    Plaintiffs and Defendant reached the PSA based on Defendant agreeing to provide Douglas with the final report related to remediation and decommissioning in accordance with the MER Work Plan.

181.    Defendant never provided Plaintiffs with the final report.

182.    Pursuant to the PSA, Defendant made an implied promise to act diligently and take reasonable measures to ensure that the Property was remediated and the Facility decommissioned, as agreed upon by the parties.

183.    Defendant failed to act in good faith and with due diligence to provide Plaintiffs with the final report and ensure that the Property was remediated and the Facility decommissioned as agreed upon by the parties.

184.    Because of Defendant's breach and failure to act in good faith and with due diligence, Plaintiffs have suffered expectation, consequential, and actual damages along with lost profits, in amounts to be determined at trial.

## COUNT VI
### CERCLA § 107

185.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

25

186.    Plaintiffs have not resolved some, or any, liability to the State of Delaware.

187.    Plaintiffs are therefore entitled to recover their response costs and damages pursuant to Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a), which provides that any person who is liable under that section shall be liable for necessary response costs incurred by any other person consistent with the NCP.

188.    Pursuant to CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), a person who, at the time of disposal of any hazardous substance, owned or operated any facility at which such hazardous substances were disposed of, is strictly liable for all costs of removal or remedial actions that are incurred by any other person at such facility.

189.    The Property, including the Facility, is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

190.    Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

191.    Lead is a "hazardous substance" under CERCLA.

192.    There have been "releases" and/or threatened "releases" of "hazardous substances" at and/or from the Property, within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22).

193.    Defendant and its predecessors-in-interests, including JCBG, were "owner[s]" and/or "operator[s]" of the Property "at the time of disposal of a[] hazardous substance" there, as those terms are used in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

194.    Defendant is liable to Plaintiffs, jointly and severally, for Plaintiffs' response costs.

195.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Plaintiffs are entitled to recover interest on site costs or damages it has paid or may pay in the future.

## COUNT VII
## Declaratory Judgment for Future Site Costs

196.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

197.    Defendant does not acknowledge that it liable to Plaintiffs for response costs and damages arising out of or related to the Property. Thus, an actual, substantial, and legal controversy has arisen and now exists between Plaintiffs, on the one hand, and Defendant, on the other, with regard to responsibility for such costs and damages and/or how these should be allocated among Plaintiffs and Defendant. The controversy is of sufficient immediacy to warrant the issuance of declaratory judgment.

198.    Absent a judicial determination setting forth the parties' rights and obligations, Plaintiffs may be obligated in the future to pay costs and damages that, under CERCLA, are in fact the responsibility of Defendant.

199.    For these reasons, Plaintiffs seek declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 113(g)(2), and Section 2201 of the Judicial Code, 28 § U.S.C. 2201, that Defendant is liable for such future site costs and damages; and/or allocating such future site costs and damages between Plaintiffs and Defendant and holding Defendant liable for the share of future site costs as allocated to it.

## COUNT VIII
## Delaware Hazardous Substance Cleanup Act – 7 *Del. C.* § 9105

200.    Plaintiffs repeat and reallege the prior allegations as if fully restated here.

201.    Lead is a hazardous substance under HSCA.

202.    Hazardous substances and/or contaminants were released at the Property, within the meaning of HSCA through the discharge of lead and related compounds from lead battery manufacturing operations by Defendant, or its predecessors, located onsite.

203.    Defendant is a liable person with respect to the release and/or threatened release of hazardous substances pursuant to Section 105 of HSCA, 7 *Del. C.* § 9105, in that Defendant, or its predecessors: (a) owned and/or operated the Property, at a time when a release of hazardous substances occurred at the Property; (b) generated, disposed of, or treated a hazardous substance at the Property; and/or (c) is responsible in any other manner for a release or threat of release of hazardous substances at the Property.

204.    Plaintiffs have and/or will incur costs performing response and remedial actions at the Property within the meaning of HSCA, which resulted from the release and/or threatened release of hazardous substances at the Property, and which response and remedial actions are consistent with the requirements of HSCA and its implementing regulations.

205.    Plaintiffs will continue to incur costs at the Property pursuant to the requirements of HSCA resulting from the release and/or threatened release of hazardous substances.

206.    Pursuant to HSCA, each person who is liable under the statute for a release or threatened release of hazardous substances is strictly liable, jointly and severally, for all costs associated with the release. 7 *Del. C.* § 9105(b).

207.    Section 105(d) of HSCA, 7 *Del. C.* § 9105(d), affords any person who has expended money to perform remedial work under HSCA with an express private right to contribution, cost recovery, and/or reimbursement against any party responsible under the statute for the hazardous substances addressed by the work performed by the claimant.

208.    Defendant, as a person liable under HSCA for the release of hazardous substances at the Property, is strictly liable to Plaintiffs for the costs which have been and/or will be incurred by Plaintiffs pursuant to HSCA, as well as interest on such costs. *7 Del. C.* § 9105(b).

209.    Defendant is liable to Plaintiffs for contribution, cost recovery, and/or reimbursement under 7 *Del. C.* § 9105(d).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment in their favor and pray the Court enter judgment in their favor and against Defendant on all counts as follows:

a)      Awarding Plaintiffs all actual, direct, indirect, compensatory, diminution in value, and consequential damages (including lost profits) as permitted under federal and state statutory and common law, including pre- and post-judgment interest;

b)      Awarding punitive damages against Defendant;

c)      Awarding Plaintiffs their costs and expenses in this litigation, including reasonable attorneys' fees and expenses, experts' fees, and other costs and disbursements;

d)      Declaring Defendant responsible for all future costs incurred by Plaintiffs at the Property; and

e)      Granting such other relief as may be just and proper.

**FOX ROTHSCHILD LLP**

*/s/ Sharon Oras Morgan*

Dated:  December 5, 2024                    Sharon Oras Morgan (No. 4287)
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Tel: (302) 654-7444
Fax: (302) 656-8920
smorgan@foxrothschild.com

*Attorneys for Plaintiffs*