IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOUGLAS DEVELOPMENT CORP., and )
JEMAL'S 700 MIDDLETOWN LLC, )
                                       )
                Plaintiffs, )
                                         )
           v. )    C.A. No.  24-1323 (MN)
                                         )
CLARIOS, LLC, )
                                         )
                Defendant. )

## MEMORANDUM OPINION

Sharon Oras Morgan, Sidney S. Liebesman, FOX ROTHSCHILD LLP, Wilmington, DE – Attorneys for Plaintiff

Eric L. Klein, Lia M. Crutchfield, BEVERIDGE & DIAMOND, PC, Boston, MA; Kennard B. Davis, BEVERIDGE & DIAMOND, PC, Baltimore, MD; Kelly E. Farnan, Jessica E. Blau, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE – Attorneys for Defendant

September 12, 2025
Wilmington, Delaware



NOREIKA, U.S. DISTRICT JUDGE

Before the Court is Defendant Clarios, LLC's ("Defendant") motion to dismiss Plaintiffs Douglas Development Corp. ("Douglas") and Jemal's 700 Middletown LLC's (collectively, "Plaintiffs") Complaint and to strike improper relief under Federal Rules of Civil Procedure 12(b)(6) and 12(f).  (D.I. 8).  For the reasons that follow, the Court will GRANT Defendant's motion to dismiss.

## I.    BACKGROUND

### A.    The Parties

This case stems from the sale of a property in Middletown, Delaware, that included a former battery manufacturing facility ("Property").  According to the Complaint, Plaintiff Douglas is a D.C. corporation that purchased the Property from Defendant.  (D.I. 1 ¶ 8).  Plaintiff Jemal's 700 Middletown LLC is a Delaware limited liability company that currently owns the Property.  (*Id.* ¶ 9).  Defendant is a Wisconsin limited liability company that previously owned the battery manufacturing facility located on the Property and sold the Property to Douglas.  (*Id.* ¶¶ 10–11).

Douglas and Defendant executed a purchase and sale agreement ("PSA") for the Property on January 22, 2022.  (*Id.* ¶ 44).  Douglas and Defendant closed on the Property on August 15, 2022.  (*Id.* ¶ 76).

### B.    The PSA

The parties' post-closing relationship – much like the Property Douglas purchased – suffers from contamination.  Douglas, having purchased property that included a battery manufacturing facility, alleges that Plaintiffs discovered "unsafe levels of lead dust" after closing[1] and have now

---

[1]    Notably, Douglas conducted environmental due diligence on the Property in the pre-closing period that revealed lead contamination.  (D.I. 1 ¶¶ 58–63).  Douglas also had a consultant prepare an environmental report.  (*Id.* ¶ 68; D.I. 9-1, Ex. 1).  The parties extended the closing deadline twice to provide Douglas more time to complete

incurred remediation costs that they bring this suit against Defendant to recover. (D.I. 1 ¶¶ 103–128). But the transaction between the parties was governed by a contract.

The PSA contains four provisions key to the current dispute: (1) a provision governing delivery of documents (specifications, insurance policies, appraisals, environmental reports, etc.) ("Section 5.2") (D.I. 1-2 § 5.2); (2) a provision regarding the remediation of prior hazardous material contamination on the Property ("Section 8.1.11") (*id.* § 8.1.11); a non-reliance provision ("Section 9.4") (*id.* § 9.4); and an as-is provision outlining that the buyer consents to accepting the property in the condition the property is in on the closing date ("Section 13") (*id.* § 13).

1.    **Section 5.2**

Section 5.2 outlines certain materials that Defendant was to deliver to Douglas and outlines disclaimer of liability. (*Id.* § 5.2). It states:

> With reasonable promptness, but in no event later than three (3) business days following the Effective Date, Seller shall deliver or make available to Buyer the following items to the extent the same exist and are in Seller's possession or under its reasonable control (collectively, the "Materials"): (a) "as built" plans and specifications for the Property; (b) all surveys and title insurance policies related to the Property; (c) Environmental reports, soils, geotechnical, engineering or other studies, remediation chronology and relevant documentation; (d) all appraisals or valuations-related to the Property; (e) all guaranties and warranties in effect with respect to all or any portion of the Property; (f) all property condition reports related to the Property; (g) all other documents related to the ownership, and operation of the Property, and reasonably requested by Buyer; (h) copies of all service, management or maintenance contracts with the Seller affecting the Property (the "Property Contracts") including but not limited to roof, HV AC and equipment guaranties and/or warranties still in effect; (i) operating statements for the current calendar year and for calendar years 2018, 2019 and 2020, (j) copies of the most recently available property tax bills and assessment notices and those for two (2) years prior thereto, available from the public records, and (1) all other documents related to the ownership, lease and operation of the Property, and reasonably requested by Buyer. **Buyer acknowledges and agrees that: (i) except as otherwise expressly set forth in this Agreement, Seller makes no**

---

environmental due diligence. (D.I. 9-1, Ex. 2). After a third amendment to the PSA, the parties set a closing date and Douglas indicated that it had "completed all of the inspections that [it] desired to perform as to the Property and desire[d] to waive its rights to terminate the Agreement by reason of the Inspection period." (*Id.* at 7).

**representation or warranty, express or implied with respect to the Materials and Seller hereby expressly disclaims any and all liability for any such representations or warranties, express or implied, regarding the Materials; and (ii) except as otherwise expressly provided herein, Seller shall have no liability to Buyer resulting from Buyer's use of or reliance upon the Materials.** Notwithstanding the foregoing, to Seller's Knowledge (as defined herein), the Materials heretofore delivered or otherwise made available to Buyer (A) include the documents (other than any confidential information) that are used by Seller in the day-to-day operation and management of the Property, (B) include the documents (other than confidential information) that are reviewed in connection with the preparation of financial statements and reports submitted to the Internal Revenue Service and/or its investors, and **(C) do not contain any fraudulent or materially inaccurate information relating to the Property or Seller in the Materials.** For purposes of this Agreement "Seller's Knowledge" shall mean the actual knowledge of Garry Wayne Dietrich following reasonable inquiry of the person responsible for the applicable matter; provided, however, that so qualifying Seller's Knowledge shall in no event give rise to any personal liability on the part of Garry Wayne Dietrich, any officer, director or employee of Seller or its affiliates on account of any breach of any representation or warranty made by Seller herein.

(*Id.*) (emphasis added).

    **2.**    <u>**Section 8.1.11**</u>

Section 8.1.11– a subject of the bulk of the parties' disagreements – is an acknowledgement of prior contamination on the Property and an explanation of the allocation of the parties' responsibilities.  (D.I. 1-2 § 8.1.11).  It states:

Buyer acknowledges that the prior owner of the Property conducted operations at the Property that resulted in a release of Hazardous Materials on the Property and specifically lead (the "Prior Contamination"). **The prior owner and Seller have remediated the Property under the oversight of the U.S. Environmental Protection Agency and the Delaware Department of Natural Resources and Environmental Control. Notwithstanding anything in this Agreement to the contrary, Buyer assumes responsibility for any further remediation and exacerbation of the Prior Contamination.** Seller represents and warrants that, except for the Prior Contamination, or as identified in the Materials, Seller has not received any written notice or other written communication from any Person (including but not limited to a Governmental Authority) relating to non-compliance with Hazardous Materials Law or the remediation of Hazardous Materials or the possible liability of Seller pursuant to any Hazardous Materials Law, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing. The term "Hazardous Materials" as used herein includes, without limitation, hazardous materials, hazardous wastes, hazardous or toxic substances, pfas, polychlorinated biphenyls or related or similar materials, asbestos or any

material containing asbestos, or any other substance or material as may be defined as a hazardous or toxic substance by any federal, or state environmental law, ordinance, rule or regulation including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 1251 et seq.), the Clean Air Act (42 U.S.C. Sections 7401 et seq.), applicable laws of the State of Delaware, and in the regulations adopted and publications promulgated pursuant thereunder. The term "Hazardous Materials Laws" includes any and all federal, and state laws, rules, regulations, statutes, and requirements pertaining or relating to Hazardous Materials. Buyer acknowledges and agrees that the only representation and warranty that Seller has made with respect to the environmental condition of the Property or its compliance with Hazardous Materials Laws is set forth in this Section 8.1.11.

(*Id.*) (emphasis added).

### 3.    Section 9.4

Section 9.4 disclaims the buyer's reliance on the seller's representations.  (*Id.* § 9.4).  It

states:

Buyer is a sophisticated investor in real property assets and has conducted, or will conduct prior to Closing, an independent evaluation of the Property, including, without limitation, the Materials. **Buyer has not relied on any representation and warranty of Seller regarding the condition of the Property or the accuracy or completeness of any documents, reports or other information (written or oral) provided to Buyer in connection with Buyer's due diligence investigation of the Property except as otherwise expressly set forth in this Agreement.** Buyer has familiarized itself with the information contained within the Materials and Buyer has elected to proceed with purchasing the Property with an understanding of the matters disclosed therein.

(*Id.*) (emphasis added).

### 4.    Section 13

Finally, Section 13 is an as-is provision that contains considerable detail.  (*Id.* § 13).  It

states:

<u>As-is sale</u> **Buyer acknowledges and agrees that upon closing seller shall sell and convey the property to buyer and buyer shall accept the property "as is, where is"** except as expressly provided in this agreement or the documents delivered by seller or tenant at closing pursuant to section 10 (the "closing documents"). **The**

term "as is, where is" shall be interpreted to include, without limitation, that buyer is agreeing to accept the property in the condition or state such property is in on the closing date, with all faults and conditions thereon, now or hereafter existing, whether known or unknown, including any conditions relating to the release or threat of release of hazardous materials to the environment from, at or on such property, and without any express or implied agreement, representation, warranty or obligation on the part of seller of any kind save as set out in this agreement or the closing documents. Without limiting the generality of the foregoing, buyer acknowledges that it has been, or will be, provided a thorough and independent opportunity to inspect the property and materials, to inquire as to its past uses and history, and to conduct such testing and evaluation as it in its sole discretion may deem necessary. Buyer acknowledges and agrees that seller has not made and does not make any representations, warranties, promises, covenants, agreements of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to (a) title to the property (other than as set forth in the deed), (b) allow able uses of the property, (c) the suitability of the property for development or any or all uses to which buyer may wish to put the property, now or in the future, (d) the economic viability of the property, (e) the existence of any latent defects, or the physical quality or condition of the property, (f) the presence or absence of any uncontained hazardous materials on or under the property, (g) the compliance of the property or its operation with any applicable laws, (h) the habitability, merchantability or fitness for a particular purpose, security or use of the property, (i) the accuracy, or completeness of any information or documentation supplied to buyer in connection with the property prepared by a third-party, or (j) the environmental or structural condition of the property, save as expressly set forth in this agreement or the closing documents. Except as specifically provided in this agreement or the closing documents, buyer agrees that it is acquiring the property subject to all present and future claims, liabilities, suits, actions, penalties and investigations which may arise with respect to the property including the condition of either of them, its or their compliance with applicable laws, and whether any hazardous material has been or may have been released or present on or under such property. Buyer, represents that it is a sophisticated owner of real property, and acknowledges that it has entered into this agreement on the understanding that buyer has conducted all inspections of the property as it deems necessary, advisable and appropriate to satisfy itself of the condition of such property, including inspections of the environmental condition of the property necessary to inform its understanding of whether any environmental remediation may now or in the future be necessary at or with respect to such property. Seller shall have no obligation or responsibility to the buyer after closing with respect to any matter relating to the property, or the condition thereof save as otherwise expressly provided in this agreement or the closing documents. For the avoidance of doubt, buyer agrees during its period of ownership of the property to indemnify and hold seller harmless from all liabilities, claims, demands, liens, costs and expenses (including reasonable attorneys' fees) arising from any government order or government

**request that either buyer, or provided seller promptly gives buyer written notice thereof, seller, may receive during buyer's or its affiliates', subsidiaries' or joint venturers' ownership of the property which requires either party to investigate, remove, dispose of, and/or remediate hazardous substances existing on the property, whether known or unknown, at the time of closing; provided, however, the failure of seller to promptly give written notice to buyer as required by this section shall not relieve buyer of its indemnity obligations hereunder except to the extent that buyer is prejudiced by such failure.** This **indemnity shall not apply** to any government fines, actions, demands or civil penalties imposed against seller or any predecessor-in-interest of seller by **reason of any act or omission of seller or such predecessor-in-interest occurring prior to closing.** Notwithstanding anything to the contrary herein, the **waivers and releases set forth in this section 13 shall not apply to any of the following: (a) any act, omission and/or fraud perpetrated by seller,** (b) any obligation of seller not otherwise agreed to by buyer which expressly survives closing under this agreement or seller's closing deliveries and (c) the impleading of seller in the event that a third party files a claim in tort which solely relates to the period prior to closing. This section 13 shall survive closing and the delivery of the deed and any termination of this agreement, without time limitation.

(*Id.*) (emphasis added) (text case altered).

### C.   <u>The Current Dispute</u>

Plaintiffs contend that Defendant "misrepresented the facility's contamination to Douglas and government agencies alike." (D.I. 12 at 2). Plaintiffs bring eight claims against Defendant: (1) fraud in the inducement; (2) fraudulent concealment; (3) contractual fraud; (4) negligent misrepresentation; (5) breach of implied covenant of good faith and fair dealing; (6) recovery of response costs and damages pursuant to Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a); (7) declaratory judgment for future site costs; and (8) relief under the Delaware Hazardous Substance Cleanup Act (7 Del. C. § 9105). (D.I. 1 ¶¶ 130–209). Defendant argues that all claims are "straightforwardly barred by the [] property sale agreement" and that now, where a "buyer and seller transparently allocate environmental cleanup risk in a property sale agreement," the Court should "enforce that agreement." (D.I. 9 at 1). Plaintiffs disagree with Defendant on the PSA's reach and on the interpretation of key provisions. (*See* D.I. 12).

### D.    Procedural History

On December 5, 2024, Plaintiffs initiated this action against Defendant.  (D.I. 1).  On February 10, 2025, Defendant moved to dismiss for failure to state a claim and to strike improper relief.  (D.I. 8, 9).  Plaintiffs filed an answering brief on March 24, 2025.  (D.I. 12).  Defendant replied on April 7, 2025.  (D.I. 17).  Following this briefing, Plaintiffs also filed a motion for leave to file a sur-reply[2] to respond to Defendant's reply brief on April 10, 2025, which Defendant responded to on April 11, 2025.  (D.I. 19, 20).  The Court now addresses the motion to dismiss.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Under Rule 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  Nonetheless, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *Lutz*, 49 F.4th at 327.  The Court does not accept "bald assertions," "unsupported conclusions and unwarranted inferences," *Finkelman v. Nat'l Football League*, 810 F.3d 187, 202 (3d Cir. 2016), or allegations "so threadbare or speculative that they fail to cross the line between the conclusory and the factual."  *Connelly*, 809 F.3d at 790 (citation omitted).  Instead, the

---

[2]    The Court did not rely on the arguments at issue in Plaintiffs' motion for leave to file a sur-reply.  And, in any case, Defendant stated it had no objection to the proposed sur-reply.  (D.I. 20 at 1).  Therefore, the Court will deny Plaintiffs' motion.

pleadings must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**B.    The Rule 9(b) Pleading Standard for Fraud**

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  This is a "heightened pleading standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (Rule 9(b) has "stringent pleading restrictions").  "[T]o comply with Rule 9(b), [a complaint] must allege 'the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation' and must state 'the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged.'"  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (quoting *Frederico*, 507 F.3d at 200).

Here, the Complaint alleges that: (1) Defendant made false representations to Douglas that Douglas justifiably relied upon and without which Plaintiffs would not have entered into the PSA (fraud in the inducement); (2) Defendant fraudulently concealed the true condition and status of the Property's environmental remediation and made false, knowing representations regarding the Property's remediation and decommissioning (fraudulent misrepresentation); and (3) Defendant made a false contractual representation justifiably relied upon by Plaintiffs (contractual fraud). (D.I. 1 ¶¶ 130–160).  "[B]ecause [these] claims sound in fraud," they "must be stated with particularity" under the heightened standard of Rule 9(b).  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996); *Carson v. HP Inc.*, No. 22-208 (CJB), 2024 WL 4300653, at *8 (D. Del. Sept. 26, 2024).

III.    **DISCUSSION**

A.    **The Fraud and Negligent Misrepresentation Claims**

1.    **Common Law Fraud and Negligent Misrepresentation**

Plaintiffs bring claims for common law fraud – fraud in the inducement (Count I) and fraudulent concealment (Count II). (D.I. 1 ¶¶ 130–150). Plaintiffs plead a claim for fraudulent inducement based on Defendant's representations made prior to and after the closing of the Property. (*Id.* ¶¶ 131). To state a claim for fraud or fraudulent inducement:

> a plaintiff must plead with particularity the following elements: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. An action for fraud can occur not only where there is an overt misrepresentation but may exist where there is a deliberate concealment of material facts or silence when one ha[s] a duty to speak.

*Duffield Assocs. v. Meridian Architects & Engineers, LLC*, No. S10C-03-004, 2010 WL 2802409, at *4 (Del. Super. Ct. 2010); *CLEAResult Consulting, Inc. v. EnerNOC, Inc.*, No. 17-837 (MAK), 2017 WL 4638592 at *5 (D. Del. Oct. 16, 2017).

As to fraudulent concealment, Plaintiffs plead that Defendant fraudulently concealed the true condition of the Property's remediation and decommissioning. (D.I. 1 ¶¶ 140–150). Plaintiffs must plead sufficient facts to show that: "(1) the defendant deliberately concealed a material fact or remained silent in the face of a duty to speak, (2) the defendant acted with scienter, (3) the defendant had an intent to induce plaintiff's reliance upon the concealment, (4) causation, and (5) plaintiff suffered damages resulting from the concealment." *Banks v. E.I. du Pont de Nemours & Co.*, No. 19-1672 (MN), 2022 WL 3139087 at *12 (D. Del. Aug. 4, 2022) (citation omitted); *Fishlock v. Glob. Plasma Sols. Inc.*, No. 23-522 (SB), 2024 WL 1156719 at *2 (D. Del. Mar. 18, 2024).

Plaintiffs also allege negligent representation (Count IV).  (D.I. 1 ¶¶ 161–175).  A negligent misrepresentation claim must show that "(1) the defendant made a misrepresentation of material fact, (2) with knowledge of its falsity, (3) with the intent to induce the plaintiff to act on it, and (4) injury must result to the plaintiff, acting in justifiable reliance on the misrepresentation." *Tredennick v. Bone*, 323 F. App'x 103, 105 (3d Cir. 2008).  For each of these claims, Plaintiffs point to statements made outside the contract.  (D.I. 1 ¶¶ 130–175).

Defendant first argues that the common law fraud and negligent misrepresentation claims should be dismissed because they are barred by the anti-reliance language in the PSA.  (D.I. 9 at 8).  The Court agrees.  Sections 5.2, 8.1.11, 9.4 and 13 each contain anti-reliance language.  Plaintiffs dispute that the language in those provisions bars their claims, arguing instead that "Douglas did not affirmatively disclaim reliance upon extracontractual statements."  (D.I. 12 at 11).  Plaintiffs make four main arguments in support of their position: (1) Section 5.2 is written from Defendant's perspective and carves out fraudulent or inaccurate information (*id.* at 13); (2) Section 8.1.11 lacks any affirmative statement of non-reliance (*id.* at 13); (3) Section 9.4 does not apply to environmental conditions (*id.* at 12); and (4) that Section 13 also lacks an affirmative statement of non-reliance and excludes fraud (*id.* at 14).  The Court addresses these in turn.

As a preliminary point, Plaintiffs' reading of the contract is often untenable.  In regard to Section 5.2, the provision states that:

> **Buyer acknowledges and agrees** that: (i) except as otherwise expressly set forth in this Agreement, Seller makes no representation or warranty, express or implied with respect to the Materials; and (ii) except as otherwise expressly provided herein, Seller shall have no liability to Buyer resulting from Buyer's use of or reliance upon the Materials.[3]

---

[3]    The provision also states that "Notwithstanding the foregoing, to Seller's knowledge (as defined herein), the Materials . . . do not contain any fraudulent or materially inaccurate information relating to the Property or Seller in the Materials."  (D.I. 1-2 § 5.2).  But that

(D.I. 1-2 § 5.2) (emphasis added). Thus, *Douglas* – the "Buyer" – affirmatively disclaimed reliance and agreed to no assignment of liability.

Section 8.1.11 similarly addresses a statement made from the buyer's perspective: "Buyer acknowledges and agrees that the only representation and warranty that Seller has made with respect to the environmental condition of the Property or its compliance with Hazardous Materials Laws is set forth in this section 8.1.11." (*Id.* § 8.1.11). Plaintiffs quote this very language, yet they argue that Section 8.1.11 "does not contain the critical language stating Douglas did not rely on other representations." (D.I. 12 at 13). Here, unlike in *FdG Logistics LLC v. A&R Logistics Holdings*, the case cited by Plaintiffs, the provision begins with the *buyer's* affirmative acknowledgement and agreement. 131 A.3d 842, 857–60 (Del. Ch. 2016) ("[t]he language to disclaim [extracontractual] reliance may vary . . . but the disclaimer must come from the point of view of the aggrieved party (or all parties to the contract) to ensure the preclusion of fraud claims").[4]

Similarly, Section 9.4 contains clear anti-reliance language, stating that "Buyer has not relied on any representation and warranty of Seller regarding the condition of the Property or the accuracy or completeness of any documents, reports or other information (written or oral) provided to Buyer . . . except as otherwise expressly set forth in Agreement." (D.I. 1-2 § 9.4). Plaintiffs attempt to circumvent the clear language in this provision, averring that: the "condition of the property" addresses only observable characteristics, not environmental contamination; Section 9.4

---

sentence exists alongside the Buyer's agreement that the Seller shall have no liability resulting from the Buyer's use of or reliance on the Materials.

[4] Delaware courts distinguish between contracts with representation clauses set forth from the seller's point of view from those written from the aggrieved buyer's point of view. *FdG*, 131 A.3d at 859-60.

preserves claims based on contractually required environmental disclosures mandated by Section 5.2;[5] the PSA's preservations of rights, powers, and privileges provided at law or in equity sustains extracontractual fraud claims unless expressly disclaimed; and, finally, Section 9.4 only disclaims reliance on representations made by Defendant, and not its consultants or contractors. (D.I. 12 at 12–13).

Plaintiffs' attempts to differentiate between "observable characteristics" and environmental conditions are unavailing. That the PSA references "environmental" conditions in other provisions does not mean that Section 9.4 is not a general anti-reliance provision. The presence or absence of contamination is logically an aspect of a property's "condition." *See Format Corp. v. Widewaters Prop. Dev. Corp.*, 162 F. App'x 168, 171 (3d Cir. 2006) ("a court may only construe a facially unambiguous term to be something other than its plain meaning when the plain meaning would lead to an absurd *and* unreasonable result.") (internal citation omitted) (emphasis in original); *Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F. Supp. 3d 428, 438 (D. Del. 2023), *appeal dismissed sub nom. Prime Victor Int'l Ltd. v. Simulacra Corp.*, No. 23-2622, 2024 WL 958377 (3d Cir. Jan. 12, 2024) (explaining that Delaware courts "enforce the plain meaning of clear and unambiguous language").

---

[5] Plaintiffs do not appear to understand the implications of this particular argument. "[T]he 'bootstrapping doctrine' under Delaware law bars a common law fraud claim that is duplicative of a related breach of contract claim." *Rheault v. Halma Holdings Inc.*, No. 23-700 (WCB), 2023 WL 8005318, at *2 (D. Del. Nov. 7, 2023). Therefore, "a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort." *OC Tint Shop, Inc. v. CPFilms, Inc.*, No. 17-1677 (RGA), 2018 WL 4658211, at *5 (D. Del. Sept. 27, 2018) (internal quotation marks omitted). The exception is that, "if the alleged contractual breach is accompanied by the breach of an independent duty imposed by law, the same factual assertions may support both a breach of contract and tort claim." *Id.* For Plaintiffs to argue that Section 5.2 covers contractually required environmental disclosures subject to Section 9.4's "carve out," they would be pleading a fraud claim duplicative of a claim for a breach of "contractual obligations rather than mere due diligence." (D.I. 12 at 12).

With that, as the Court has already noted, the contract contains multiple clear disclaimers. And, as a last point in reference to Plaintiffs' Section 9.4 arguments, it would be absurd for the Court to interpret a provision addressing the Seller's statements to exclude statements made by consultants or contractors who would be speaking on the Seller's behalf. *See, e.g., In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1261 n.1 (Del. Ch. 2015) (collecting cases). Regardless, Plaintiffs' claims involve alleged misrepresentations by Defendant.

Finally, although Section 13 carves out fraud from its "waivers and releases," the provision contains multiple acknowledgements from the buyer's perspective that:

> Buyer acknowledges and agrees that Seller has not made and does not make any representations, warranties, promises, covenants, agreements of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to . . . [t]he presence or absence of any uncontained hazardous materials on or under the property, [] the compliance of the property or its operation with any applicable laws . . .

(D.I. 1-2 § 13). Thus, again, Douglas agreed that no representations or warranties had been made.

Delaware courts enforce contractual provisions that "identify the specific information on which a party has relied and which forecloses reliance on other information." *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015); *Keystone Assocs. LLC v. Fulton*, No. 18-1235 (MN), 2019 WL 3731722, at *4 (D. Del. 2019) (citation omitted). Where a contract contains an effective anti-reliance clause, extra-contractual representations cannot substantiate common law fraud or negligent misrepresentation claims. *ChyronHego Corporation v. Wight*, 2018 WL 3642132, at *1 (Del. Ch. July 31, 2018); *see also Prairie Capital*, 132 A.3d at 50 (stating that a party cannot promise "that it will not rely on promises and representations outside of the agreement and then shirk its own bargain") (quoting *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006)). Because the PSA contains multiple provisions with clear

anti-reliance language, Plaintiffs cannot now rely on extra-contractual statements to establish claims for common law fraud or misrepresentation.

Thus, the Court will dismiss Count I (fraud in the inducement); Count II (fraudulent concealment) and Count IV (negligent misrepresentation).

### 2.    **Contractual Fraud**

Plaintiffs' contractual fraud claim rests on Section 8.1.11, in which Defendant represented that "prior owner and Seller have remediated the property under the oversight of the U.S. environmental Protection Agency and the Delaware Department of Natural Resources and Environmental Control." (D.I. 1-2 § 8.1.11). The parties dispute how to interpret "have remediated" – Plaintiffs argue that this means remediation was completed, or, in the alternative, that the provision is ambiguous and requires extrinsic evidence, while Defendant disagrees.[6] (D.I. 9 at 12; D.I. 12 at 4–5).

"The interpretation of a contract under Delaware law 'is a question of law; thus, where the terms of a contract are unambiguous, the meaning thereof is suitable for determination on a motion to dismiss.'" *Talley v. Christiana Care Health Sys.*, No. 17-926 (CJB), 2018 WL 5045363 at *3 (D. Del. Oct. 17, 2018) (citing *Huff Energy Fund, L.P. v. Gershen*, No. 11116, 2016 WL 5462958, at *6 (Del. Ch. Sept. 29, 2016); *Monier, Inc. v. Boral Lifetile, Inc.*, No. 3117, 2008 WL 2168334, at *5 (Del. Ch. May 13, 2008). "Where there are two (or more) reasonable interpretations of a contract . . . it is ambiguous, and the Court may not, on a Rule 12(b)(6) motion to dismiss, choose between two differing reasonable interpretations of ambiguous provisions." *Monier, Inc.*, 2008

---

[6]    Defendant also argues that Plaintiffs do not plead justifiable reliance on any contractual fraud and that Plaintiffs' contractual fraud claim is time-barred. (D.I. 9 at 13-14). Because the Court finds that Section 8.1.11 is not a representation that Defendant finished remediation or fully remediated the Property, it does not address those alternative arguments.

WL 2168334, at *5 (internal quotation marks and citation omitted).  When "determining whether disputed terms are subject to more than one reasonable interpretation, 'Delaware courts are obligated to confine themselves to the language of the document and [may] not [ ] look to extrinsic evidence to find ambiguity.'" *Huff Energy*, 2016 WL 5462958, at *6 (first alteration in original) (citation omitted).

Here, the Court does not find ambiguity[7] in the contract.  The sentence immediately following Defendant's representation of remediation in this provision – a sentence that Plaintiffs' briefing fails to cite or address – states, "Notwithstanding anything in this Agreement to the contrary, Buyer assumes responsibility for any further remediation and exacerbation of the Prior Contamination." (D.I. 1-2, § 8.1.11).  If Defendant had fully remediated the property, there would be no need for Douglas to assume responsibility for "further remediation," or possibility of "exacerbation of the Prior Contamination."  But Douglas did assume that responsibility.  And Plaintiffs cannot circumvent it now.  The Court will dismiss Count III.

## B.    Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs' claim for a breach of the implied covenant of good faith and fair dealing rests on the existence of an implied promise from Defendants to "act diligently and take reasonable measures to ensure that the Property was remediated and the Facility decommissioned, as agreed

---

[7]    Plaintiffs point to Defendant's statement that "[r]emediate can mean to *engage* in remediation as well as to *complete* remediation" to suggest ambiguity. (D.I. 12 at 5).  But a word in a contract is not interpreted in a vacuum, and the next sentence in the very provision at issue is of obvious importance.  *See Huff Energy*, 2016 WL 5462958, at *6. Plaintiffs' other arguments in support of their interpretation of full remediation hinge on extrinsic considerations involving what it would mean to be under regulatory agency oversight and in compliance with agency standards and regulations.  Although the PSA states that remediation occurred "under the oversight of the" EPA and Delaware Department of Natural Resources and Environmental control, Plaintiffs provide only argument and no evidence or allegations to support their position that agencies would not sanction incomplete remediation.  (D.I. 1-2, § 8.1.11).

upon by the parties" and the allegation that "Defendant failed to act . . . to provide Plaintiffs with the final report and ensure that the Property was remediated and the Facility decommissioned." (D.I. 1 ¶¶ 182–183).

To properly plead a claim for breach of the implied covenant, "the plaintiff must (1) allege a specific implied contractual obligation, (2) a breach of that obligation, and (3) resulting damage." *Duncan v. Garvin*, No. K20M-11-022 (JJC), 2024 WL 3596138 at *8 (Del. Super. Ct. July 31, 2024), *reargument denied*, No. K20M-11-022 (JJC), 2024 WL 4286265 (Del. Super. Ct. Sept. 25, 2024). The covenant of good faith and fair dealing is implied in every agreement in Delaware. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). It "involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (citing *Dunlap*, 878 A.2d at 441); *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996); *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). Courts will "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec*, 991 A.2d at 1126.

Plaintiffs do not state a claim for a breach of the implied covenant of good faith and fair dealing. To do so, Plaintiffs would have had to plead that Defendant's alleged obligation of remediation and delivery of a remediation report was a contractual gap or development neither party anticipated. *Id.* at 1125. However, Sections 5.2 and 8.1.11 address both Defendant's responsibility to provide certain listed materials and the matter of remediation – indeed, Plaintiffs

themselves allege and argue that those obligations arise from the PSA.[8]  (D.I. 1 ¶¶ 180, 182; D.I. 12 at 4–5, 12).  Thus, this is not a situation where the "contract does not specifically address an issue" such that the implied covenant can "serve[] as a limited gap filler."  *Duncan*, 2024 WL 3596138 at *8.  The Court will dismiss Count V.

### C.    CERCLA § 107, Declaratory Judgment for Future Site Costs, and the Delaware Hazardous Substance Cleanup Act

Plaintiffs' final claims seek recovery of site costs and damages pursuant to Section 107(a) of the Federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) (Count VI); declaratory judgment for future site costs under Section 113(g)(2) of CERCLA (Count VII); and costs under the Delaware Hazardous Substance Cleanup Act ("HSCA"), 7 Del. C. § 9105 (Count VIII).  Defendant argues that Plaintiffs' CERCLA and HSCA claims are either barred because Douglas assumed Defendant's CERCLA liability via the PSA, or, in the alternative, inadequately pleaded.  (D.I. 9 at 17–18).  Plaintiffs respond that the PSA's language is not specific enough to find a transfer of CERCLA or HSCA financial responsibility and that the Complaint correctly pleads that Defendant's actual or threatened releases caused Plaintiffs to incur response costs.  (D.I. 12 at 15–19).  The Court agrees with Defendant that Douglas assumed CERCLA and HSCA liability[9] under the terms of the PSA.

---

[8]    Plaintiffs frame their implied covenant claim as Defendant's lack of good faith in performing existing obligations, explaining that Defendant's "PSA obligations included sharing environmental reports and relevant documentation with 'reasonable promptness.' (PSA § 5.2).  Implied in that promise was the timely disclosure of Clarios's final remediation report . . . the implied covenant is especially relevant in situations involving one party's exercise of discretion under an agreement."  (D.I. 12 at 10).  But Plaintiffs again misleadingly cite the PSA.  Section 5.2 does not simply state "reasonable promptness" that would give rise to discretion.  It actually sets forth that the materials listed were to be delivered or made available "[w]ith reasonable promptness, but in no event later than three (3) business days following the Effective Date."  (PSA § 5.2).

[9]    The analysis for CERCLA and the HSCA is the same in this context.  The Court references CERCLA but its reasoning applies to both statutes.

A buyer in a property sale may contractually assume a seller's CERCLA liability.[10]  *Scott Fetzer Co. v. Douglas Components Corp.*, No. 11,327, 1994 WL 148282 at *11 (Del. Ch. Apr. 12, 1994), *dismissed sub nom. Douglas Components Corp. v. The Scott Fetzer Co.*, 734 A.2d 640 (Del. 1999) ("[t]he plain language of Section 4(g) of the Agreement mandates the conclusion that CERCLA liabilities . . . were assumed by defendants upon their purchase . . ."). In such a situation, the buyer's CERCLA Section 107 claim is barred.  *Id.* at *8–11.

Here, the PSA contains two provisions discussing assumption of liability that implicates CERCLA.  Section 8.1.11 provides that "Buyer assumes responsibility for any further remediation," in the express context of hazardous materials release and contamination.  (D.I. 1-2 § 8.1.11).  And, Section 13, the "as-is" provision, states that the

> buyer is agreeing to accept the property in the condition or state such property is in on the closing date, with all faults and conditions thereon, now or hereafter existing, whether known or unknown, **including any conditions relating to the release or threat of release of hazardous materials to the environment** from, at or on such property . . . seller shall have no obligation or responsibility to the buyer after closing with respect to any matter relating to the property, or the condition thereof save as otherwise expressly provided in this agreement or the closing documents . . . **buyer agrees that it is acquiring the property subject to all present and future claims, liabilities, suits, actions, penalties and investigations which may arise** with respect to the property including the condition of either of them, its or their compliance with applicable laws, **and whether any hazardous material has been or may have been released or present on or under such property**.

---

[10]    CERCLA itself also addresses indemnification:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1).  Under *Scott Fetzer*, "CERCLA liability may be transferred, as long as all parties remain jointly liable to the government or other third party CERCLA claimant," but subject to that limitation, parties to a transaction may choose to indemnify and assume financial liability.  1994 WL 148282 at 10-11.

(*Id.* § 13) (emphasis added) (text case altered).    It also assigns indemnification responsibility, providing that:

> Buyer agrees . . . **to indemnify and hold seller harmless** from **all liabilities, claims, demands, liens, costs and expenses** (including reasonable attorney's fees) arising from any government order or government request that buyer . . . may receive . . . **which requires either party to investigate, remove, dispose of, and/or remediate hazardous substances** existing on the property."

(*Id.* § 13) (emphasis added) (text case altered).

Plaintiffs argue that the assumption language in Section 8.1.11 is not sufficiently specific because it only refers to "Prior Contamination" – a singular release – and that the "further remediation" language is forward-looking and does not capture existing CERCLA liability for past contamination. (D.I. 12 at 15). The term "remediation," according to Plaintiffs, is narrow and "only encompasses physical cleanup" and not the broader liability (investigation, response, legal costs, etc.) contemplated by CERCLA. (*Id.* at 16). As to Section 13, Plaintiffs argue that the PSA was not a knowing agreement and that the provision carves out fraud.[11] (*Id.* at 17).

Even assuming that Plaintiffs are right about Section 8.1.11, Section 13 remains a hurdle that Plaintiffs cannot overcome. Section 13 is sufficiently specific, explicitly contemplates hazardous material release, and contains indemnification language. The court in *Scott Fetzer* found an assumption of liability from much less. There, the purchase agreement at issue set forth that the buyer "shall assume . . . all other liabilities and obligations of every kind of [the seller] incurred by [the seller] or arising by reason of [the seller's] ownership or its conduct of the Business[.]" *Scott Fetzer*, 1994 WL 148282 at *10. The court held that the words "all other liabilities and obligations of every kind . . . necessarily include the assumption of CERCLA

---

[11]    Plaintiffs' arguments regarding Section 13 and the fraud "carveout" language appear in the briefing but are not pled in the Complaint for these claims. (D.I. 12 at 17-18).

liabilities." *Id.*  Similarly, in *Mobay Corp. v. Allied-Signal, Inc.*, the court found[12] that "in order for the Court to interpret a contract as transferring CERCLA liability, the agreement must at least mention that one party is assuming environmental-type liabilities."  761 F. Supp. 345, 358 (D.N.J. 1991).  Such "environmental-type" liabilities are certainly mentioned in Section 13.

The Court finds that Douglas assumed Defendant's CERCLA and HSCA liability and indemnified Defendant.[13]  The Court will dismiss Count VI (CERCLA § 107), Count VII (declaratory judgment for future site costs under CERCLA), and Count VIII (HSCA).

## IV.    **CONCLUSION**

The Court will GRANT Defendant's motion to dismiss.  Counts I-VIII of the Complaint are dismissed with prejudice as amendment is futile in light of the contract's language and as Plaintiffs did not request leave to amend.  An appropriate order will follow.

---

[12]    Plaintiffs cite this case for the proposition that "as-is clauses typically 'do not absolve a seller from CERCLA liability.'"  (D.I. 12 at 16).  But the contract at issue in *Mobay* was markedly different from the PSA here.

[13]    As a consequence of this finding, the Court does not reach the merits of the parties' arguments regarding whether the CERCLA and HSCA claims are sufficiently pleaded.